# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>     Respondent,<br><br>    v.<br><br>JAYMES KENDRICK LINENKOHL,<br><br>     Respondent. | DIVISION ONE<br><br>No. 79944-4-I<br><br>UNPUBLISHED OPINION |

DWYER, J. — Jaymes Linenkohl appeals his conviction for assault in the second degree. Contrary to his claim on appeal, Linenkohl was not deprived of his right to a unanimous jury verdict. We say this because the State presented evidence of only one act of assault and elected that act as the basis for the charge during its presentation to the jury. Similarly, the trial court neither abused its discretion by informing the jury that a recording of Linenkohl's statement had been redacted in accordance with the court's prior rulings nor by instructing the jurors to not concern themselves with the reasons for the court's rulings. Finally, the trial court did not abuse its discretion by admitting evidence that Linenkohl possessed and carried firearms during the event in question. We affirm.

I

Early in the morning of November 8, 2017, Kelly Nelson and Sarah Simerly returned to the property where Simerly lived with her partner, Jaymes Linenkohl. The evening before, Simerly had left the house after a dispute with Linenkohl, telephoned Nelson, her friend and co-worker, to pick her up, and stayed at Nelson's apartment for the night. The next morning, Simerly and Nelson returned to the house to gather Simerly's personal belongings. As they approached the backyard, they saw Linenkohl outside on the back porch stairs. Linenkohl approached the women. What happened from this point on was subject to factual dispute at trial.

According to Nelson, Linenkohl was demanding that Simerly come with him, telling Nelson to mind her own business, and calling Nelson a "little bitch" and a "midget." Nelson said that she looked at her phone, and Linenkohl said, "You should call 911." Nelson said that Linenkohl then backed up toward the house, telling her, "I'm going to fuck your life up." Nelson and Simerly both testified that Linenkohl was not armed at this point. Simerly said Linenkohl ran back into the house after this initial confrontation.

Simerly and Nelson then headed back to Nelson's car. Nelson said they were about halfway down the sidewalk when she heard the sound of running footsteps behind her. She said that Linenkohl then pushed her out of the way and put a gun in her face. Nelson said Simerly was "frozen" and did not say a word. Nelson said that Linenkohl kept the gun pointed at her as he grabbed Simerly by the arm and dragged Simerly toward the house. Nelson described

2

the gun that Linenkohl pointed at her as "really big. I don't know how to label guns or like what kind of gun necessarily it was. In my head it like reminds me of an AK 47 or something like that." She testified that she was afraid that Linenkohl was going to shoot her.

Simerly testified that she was running ahead of Nelson down the sidewalk toward the car when Linenkohl caught up to Nelson. She said she heard Linenkohl slam Nelson against a fence and Nelson scream, "Okay, okay, okay," sounding terrified. Simerly said she stopped running when she heard Nelson scream. Nelson ran past her. Linenkohl grabbed Simerly by the back of the neck and forced her back into the house. Simerly said Linenkohl had a shotgun in his hand at this point.

For his part, Linenkohl testified that he told Nelson that "she needed to mind her own fucking business." He said that he maintained a "stern, defensive posture" and told Nelson that "she could go now, little girl." He said Nelson said she was calling the cops, and he spun around and said something like, "You do whatever the fuck you want to do. Get the fuck out of here, get the fuck off my property."

Linenkohl denied ever physically touching Nelson, pushing her up against a fence, or chasing after her. He said that he had a Glock handgun in his possession at that point, but said he did not take the gun out of its holster or point the gun at Nelson. He said that he did not have a long gun, such as a rifle or shotgun, in his possession when he was in contact with Nelson. Linenkohl testified that he did not grab Simerly or force her into the house.

3

Nelson called 911. Simerly testified that police surrounded the house within a few minutes. Simerly said that Linenkohl "just all of a sudden started grabbing his guns and going outside and pointing them." She said that Linenkohl had two long guns, including an AUG, with him at that point, and went outside the house with the two long guns more than three times. She said Linenkohl put on a bullet proof vest. Simerly testified that she did not feel like she could leave the house until Linenkohl told her that she "better go out and handle it or a bunch of people are going to die."

Simerly left the house; she said officers put her in a police car and drove her to a nearby park. She said she told officers that morning that nothing happened and was not honest with them because she was scared. She testified that she was still not willing to be honest about what happened at the court hearings in the following weeks, including a bail hearing, because she was scared.

Linenkohl testified that he never tried to prevent Simerly from leaving the house and actually encouraged her to leave the house. He said it was her choice to leave the house. Linenkohl said he only walked near the bushes once, when he was outside with Simerly, and was not armed with a rifle at that time. Linenkohl testified that he started moving his firearms upstairs; he also testified that his Mossberg shotgun ended up propped up near the back door of the house and the AUG ended up propped up near the front door of the house. Linenkohl testified that he went outside to smoke two times; the second time the police

4

hailed him and he complied with the police's request. The police arrested Linenkohl.

The State charged Linenkohl with assault in the second degree against Nelson—specifically, assault with a deadly weapon, a rifle: "That the defendant JAYMES KENDRICK LINENKOHL in King County, Washington, on or about November 8, 2017, did intentionally assault Kelly Nicole Nelson with a deadly weapon, to-wit: a rifle." The State also charged Linenkohl with domestic violence unlawful imprisonment against Simerly. The State further alleged that Linenkohl was armed with a rifle at the time he committed both of the charged crimes ("firearm enhancement").

A jury trial commenced. On March 14, 2019, the jury found Linenkohl guilty of assault in the second degree as charged. The jury found that Linenkohl was armed with a firearm at the time he committed the assault. The court declared a hung jury on the unlawful imprisonment charge after the jury spent approximately two and a half days deliberating.

On May 3, 2019, the trial court sentenced Linenkohl to a total of 43 months of confinement on the second degree assault conviction. This included a 36 month mandatory term of confinement due to the jury's finding that Linenkohl was armed with a firearm while committing the assault. The court dismissed the unlawful imprisonment charge.

Linenkohl appeals.

II

Linenkohl first contends that the trial court erred by not instructing the jury that it must unanimously agree as to with which firearm Linenkohl was armed. Linenkohl argues that the State presented evidence of two different firearms—a rifle and a handgun—and individual jurors could have relied on different firearms in finding that Linenkohl assaulted Nelson "with a deadly weapon" as required for a conviction of second degree assault or to find that Linenkohl was armed at the time of the assault as required for the firearm enhancement. We disagree.

To convict on a criminal charge, the jury must be unanimous that the defendant committed the criminal act. State v. Coleman, 159 Wn.2d 509, 511, 150 P.3d 1126 (2007). When the prosecution presents evidence of multiple acts of like misconduct, any one of which could form the basis of a count charged, either the State must elect which of such acts it relies on for conviction or the trial court must instruct the jury to unanimously agree on a specific criminal act. Coleman, 159 Wn.2d at 511. By requiring a unanimous verdict on one criminal act, the defendant's right to a unanimous verdict based on an act proved beyond a reasonable doubt is protected. Coleman, 159 Wn.2d at 511-12.

Here, the State presented evidence of only one act of assault—the assault of Nelson with a rifle—and clearly elected that act from the time it initiated the proceedings through closing argument. First, the information specifically charged Linenkohl with assaulting Nelson with a rifle: "That the defendant JAYMES KENDRICK LINENKOHL in King County, Washington, on or about November 8, 2017, did intentionally assault Kelly Nicole Nelson with a deadly weapon, to-wit: a

6

rifle." Second, the firearms enhancement allegation specifically alleged that Linenkohl was "armed with a rifle" at the time he committed the assault.

Third, in testimony Nelson described the gun that Linenkohl pointed at her as "a really, really large gun" and "really big. I don't know how to label guns or like what kind of gun necessarily it was. In my head it like reminds me of an AK 47 or something like that." On cross-examination, Nelson confirmed that the gun Linenkohl pointed at her looked like an AK 47 and was over two feet long.

Nevertheless, Linenkohl argues that Simerly testified that he had two firearms. However, more accurately, Simerly actually testified that when Linenkohl was forcing her back to the house, directly after she heard Nelson scream, Linenkohl had a shotgun in his hand. She testified that at a later point, after she and Linenkohl had returned to the house and he "started grabbing his guns and going outside and pointing them," he had two guns on him, both long guns. Simerly specifically testified that she did not see Linenkohl carrying a handgun on his hip on the day in question. Simerly did not testify that Linenkohl had two guns at the time of the alleged assault.

Linenkohl points out that at the time of his arrest he told police he had a "Glock" on him but, again, that was at the time of arrest, not at the time of the alleged assault. Although Linenkohl said, in his recorded statement played for the jury, that he had a Glock on his waistband, there was no evidence presented that he used the Glock in the alleged assault of Nelson.

The State's presentations to the jury were consistent with this testimony. The State's opening statement and closing argument both feature the State

7

discussing evidence of one assault and clearly electing that assault as the charged criminal act. As the State described the assault in its opening statement: "When the two of them turned to flee, that is when [Linenkohl] tried to maintain that control by getting an assault rifle, telling Kelly Nelson that she would regret what she had done, that he would fuck up her world, pushed her in the back against a fence, and when she turned around she was looking down the barrel of an assault rifle thinking that she was going to be shot and killed."

The prosecutor then told the jury that the evidence would prove the crime of assault in the second degree in this way:

> The first [charged crime] is assault in the second degree against Kelly Nelson by pointing an assault rifle at her and making her think that she was going to be shot that night.
>      . . . .
> The evidence that you will have will prove beyond a reasonable doubt that the defendant committed the crime of assault in the second degree by pointing an assault rifle at Kelly Nelson, making her fear for her life.

In rebuttal closing argument, the State again specifically told the jury that Linenkohl having a gun on his hip was not a crime and that they should not convict him for that but, rather, should convict him for pointing the assault rifle at Nelson:

> [T]he fact that Mr. Linenkohl simply had guns is not something that is a crime. And there is nothing about the fact that he had more than one gun that makes that any more of a crime. The fact that he had a gun on his hip that nobody says he used during this incident is not crime. You should not convict him for having a Glock on his side. What you should convict him for is having the assault rifle and pointing it at Kelly and making her think that she was going to die.

8

The testimony and evidence at trial, as well as the State's opening and closing arguments, demonstrate that the State presented evidence of only one assault and elected that assault as the factual basis for the charge. Linenkohl's argument that the court erred by not instructing the jury that it must unanimously agree as to with which firearm Linenkohl was armed, accordingly, fails.

III

Linenkohl next asserts that the trial court erred by allowing the State to tell the jury in its opening statement that Linenkohl's recorded statement, which they would hear during the trial, was redacted, and then itself instructing the jury that the statement was redacted when it was admitted at trial. We disagree.

We review a trial court's evidentiary decisions for abuse of discretion. State v. Stenson, 132 Wn.2d 668, 701, 940 P.2d 1239 (1997). "'Discretion is abused if it is exercised on untenable grounds or for untenable reasons.'" State v. Foxhoven, 161 Wn.2d 168, 174, 163 P.3d 786 (2007) (quoting State v. Thang, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)).

During the State's opening statement, the prosecutor informed the jurors that they would hear Linenkohl's redacted statement:

> [Linenkohl] went to the precinct and he gave a statement. That statement lasted more than an hour. You're going to get to hear that statement, we will play it here. That statement is going to be subject to the same rules here in court, and so there will be some parts of it that are redacted out of that statement, but by and large, you are going to hear what Mr. Linenkohl had to say that night.

Linenkohl's counsel did not object at that time.

The next day, however, during a motions hearing outside the presence of the jury, Linenkohl's counsel objected to any mention that Linenkohl's statement

9

was redacted. The stated basis for this objection was that it was inappropriate to discuss evidence that has been excluded in front of the jury and that such mention was prejudicial because the jurors might feel that they were not getting the full version of the facts. The State responded by noting that, no matter how smoothly they tried to accomplish the redactions, there would inevitably be skips in the recording and abrupt changes in conversation. The trial court asked Linenkohl's counsel if she had any authority supporting her objection. She had none. The trial court observed that it did not think there was unfair prejudice in letting the jury know that parts of the recording had been removed, when coupled with an instruction to the jurors that they were not to speculate or consider possible reasons for the court to have ordered the redactions.

Several days later, in a discussion outside the presence of the jury before the recording was admitted, the trial court noted:

> Well, I'm concerned without an instruction that the jurors could notice that they are missing sections or parts that are redacted, and the Court's concern is that the jurors could read into that to hurt either side. And so the Court's position is instructing the jury, as we always instruct the jury, that the Court rules on the admissibility of evidence and that they're not to [be] concerned about it, and letting them know that the audio has been redacted according to that is appropriate.

Thereafter, during the testimony of a police detective, the State offered the recording of Linenkohl's statement, exhibit 35, into evidence. Linenkohl's counsel stated that she had no objection. The court instructed the jury, before the statement was played: "All right, ladies and gentlemen of the Jury, Exhibit 35 has been redacted in accordance with the Court's rulings. One of my duties has

been to rule on the admissibility of evidence. Do not be concerned during your deliberations about the reasons for my rulings on the evidence." The recording of Linenkohl's statement was then played for the jury.

At the conclusion of the trial, before sending the jury to deliberate, the court gave the jury an almost identical instruction:

> The evidence that you are to consider during your deliberations consists of the testimony that you have heard from witnesses, stipulations and the exhibits that I have admitted during the trial. If evidence was not admitted or was stricken from the record, then you are not to consider it in reaching your verdict.
> . . . .
> *One of my duties has been to rule on the admissibility of evidence. Do not be concerned during your deliberations about the reasons for my rulings on the evidence.* If I have ruled that any evidence is inadmissible, or if I have asked you to disregard any evidence, then you must not discuss that evidence during your deliberations or consider it in reaching your verdict. Do not speculate whether the evidence would have favored one party or the other.

Jury Instruction 1 (emphasis added). This instruction quoted verbatim from Washington Pattern Jury Instructions: Criminal (WPIC) 1.02, a standard instruction given to juries in criminal trials.[1]

Linenkohl fails to provide any legal authority in support of his argument that it was improper for the jury to be told that the recording of his statement was redacted. The cases fleetingly cited by Linenkohl, without any discussion or

---

[1] The trial court's preliminary jury instruction, given to the jury before opening statements, also mirrored this instruction: "*One of my duties as judge is to decide whether or not evidence should be admitted during this trial*. What this means is that I must decide whether or not you should consider the evidence offered by the parties. For example, if a party offers a photograph as an exhibit, I will decide whether it's admissible. *Do not be concerned about the reasons for my rulings*. You must not consider or discuss any evidence that I do not admit or that I tell you to disregard." (Emphasis added.)

analysis, concern instances of prosecutorial misconduct that are in no way analogous to informing the jury that a recording is redacted in accordance with the court's rulings. See, e.g., In re Glassman, 175 Wn.2d 696, 286 P.3d 673 (2012); State v. Boehning, 127 Wn. App. 511, 111 P.3d 899 (2005); State v. Perez-Mejia, 134 Wn. App. 907, 143 P.3d 838 (2006). These cases in no way support Linenkohl's present contention.

The State's opening statement referred only to admissible evidence that was expected to be presented at trial (the redacted recording). Neither the State nor the court mentioned anything about the specific statements that had been redacted from the recording.

The jury learned of no forbidden evidence. The jurors were instructed not to speculate on the reasons the redactions were made. No trial court error is shown.

IV

Linenkohl next argues that "the trial court erred in allowing speculative and extremely prejudicial evidence that officers believed they were involved in an armed standoff." Again, we disagree.

In his briefing, Linenkohl identifies only the following specific evidence that he asserts was improperly admitted—all evidence regarding his lawful gun ownership:

> The State offered evidence that Mr. Linenkohl legally owned numerous and varied firearms. RP 702-10, Ex. 35. The jury heard he openly carried a handgun. RP 792; Ex. 35. The jury heard evidence that he obtained a valid concealed weapon permit very shortly after arriving in Washington. Ex. 35.

Linenkohl notes that possession of firearms is protected by the federal and state constitutions and attempts to draw a parallel to the opinion in State v. Rupe, 101 Wn.2d 664, 683 P.2d 571 (1984). In Rupe, our Supreme Court reversed Rupe's death sentence because evidence concerning his gun collection admitted at the sentencing proceeding was irrelevant, prejudicial, and violative of his due process rights. Rupe, 101 Wn.2d at 703-08. The court stated that "in arguing that defendant's exercise of that constitutional right [possession of legal weapons] meant that he deserved the death penalty, the State attempted to draw adverse inferences from defendant's mere possession of these weapons," and held that due process prohibits use of such evidence for this purpose. Rupe, 101 Wn.2d at 707. The court held that evidence of the defendant's lawful gun collection was irrelevant and unfairly prejudicial because the guns he owned had no connection to the crime of which he was convicted and were all legally owned. Rupe, 101 Wn.2d at 708. In summarizing its decision, the court observed that, "We see no relation between the fact that someone collects guns and the issue of whether they deserve the death sentence." Rupe, 101 Wn.2d at 708.

Here, unlike in Rupe, evidence of Linenkohl's gun possession was relevant to proving both charged crimes and the firearm enhancements. To convict Linenkohl of unlawful imprisonment, the State had to prove that Linenkohl's restraint of Simerly was accomplished by physical force, intimidation, or deception. Evidence that, on the day in question, Linenkohl possessed numerous firearms in the house and carried a handgun on his person was

material to the State's effort to prove that his alleged restraint of Simerly was accomplished by physical force or intimidation. Simerly's testimony about the firearms Linenkohl possessed at the house during the time at issue is relevant to show that she was aware of the firearms, which bore on her state of mind regarding why she remained with Linenkohl in the house.

Similarly, to convict Linenkohl of second degree assault, the State had to prove that he assaulted Nelson with a deadly weapon. Evidence of the rifle used during his alleged assault on Nelson proved an essential element of that crime—his use of a deadly weapon. As to the firearm enhancements, the State had to prove that Linenkohl was armed with a firearm at the time he committed both of the charged crimes. Evidence of the firearms, even if legally owned, was essential to prove this enhancement. In short, evidence of the firearms was closely connected to the charged crimes, unlike in Rupe.

Regarding prejudice, Linenkohl fails to point to any specific evidence in the record that the State attempted to draw prejudicial adverse inferences from his mere ownership of the weapons. Linenkohl alleges that the jury was allowed to speculate criminal intent from his lawful ownership of weapons, but cites to no admitted evidence or allowed argument in support of this claim.

Linenkohl's briefing also generally refers to evidence of "consciousness of guilt." This appears to challenge the admission of evidence that he was seen by police walking or crawling outside the house with what appeared to be a rifle, pointing a rifle from an upstairs window, and taking other actions that led certain police officers to believe that he was surveying the police and readying himself

for armed resistance to arrest. This evidence was admitted by the trial court in part based on its materiality to Linenkohl's consciousness of guilt. For his part, Linenkohl asserts that the trial court erred because this was not evidence, such as flight from the crime scene, that would establish his consciousness of guilt.

Linenkohl views this principle too narrowly. Attempts to evade apprehension and deception are commonly admitted as consciousness of guilt. See, e.g., State v. McDaniel, 155 Wn. App. 829, 854, 230 P.3d 245 (2010) (Washington law does not define what circumstances constitute flight, so evidence of resistance to arrest, concealment, assumption of a false name, and related conduct are admissible if the trier of fact can reasonably infer the defendant's consciousness of guilt of the charged crime). The trial court's ruling in this regard was by no means novel.

Linenkohl also asserts that this evidence improperly relies on a pyramiding of inferences to achieve materiality. His contention is that the evidence shows only the police officers' state of mind, not his own state of mind. However, this is in no way different than the inference raised by evidence of flight when a suspect sees a police car and runs in the opposite direction. The police officer may infer one of two things: either the suspect is engaging in a jog to better his or her health, or the suspect is trying to evade apprehension. It is for the jury to decide if the inferences drawn by the police are valid. To this point, we note that the jury did not convict Linenkohl of the unlawful imprisonment charge; this tends to show that the jury was aware of its duty to weigh the evidence and was not inclined to blindly pyramid inferences as Linenkohl alleges.

In conclusion, the trial court did not abuse its discretion by admitting evidence that Linenkohl owned and carried firearms at the scene. See Stenson, 132 Wn.2d at 701 (we review a trial court's evidentiary decisions for abuse of discretion).

V

Linenkohl has submitted a statement of additional grounds for review (SAG) that identifies four assignments of error. We are unpersuaded by Linenkohl's arguments.

First, Linenkohl argues that the trial court erred by not including intent as an element in the "to-convict" jury instruction for the second degree assault charge. Assault in the second degree is defined by statute, in relevant part, as follows: "(1) A person is guilty of assault in the second degree if he or she, under circumstances not amounting to assault in the first degree . . . (c) Assaults another with a deadly weapon." RCW 9A.36.021.

The court's "to-convict" jury instruction for the second degree assault charge set forth the following elements:

> To convict the defendant of the crime of assault in the second degree, as charged in Count I, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That [on] November 8, 2017, the defendant assaulted Kelly Nelson with a deadly weapon; and
> (2) That this act occurred in the State of Washington.

Jury Instruction 8. This instruction mirrors WPIC 35.19.

The court's jury instructions properly defined assault to the jury as including the intent required for assault:

An assault is an *intentional* touching or striking or shooting of another person, with unlawful force, that is harmful or offensive regardless of whether any physical injury is done to the person. A touching or striking or shooting is offensive if the touching or striking or shooting would offend an ordinary person who is not unduly sensitive.

An assault is also an act, with unlawful force, *done with the intent* to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury.

Jury Instruction 12 (emphasis added). This instruction mirrors WPIC 35.50.

The court further defined intent for the jury: "A person acts with intent or intentionally when acting with the objective or purpose to accomplish a result that constitutes a crime." Jury Instruction 11. This instruction mirrors WPIC 10.01.

The trial court's "to-convict" instruction properly set forth the elements of assault in the second degree. The court's definitional instruction properly defined assault as requiring intent. There was no error.

Linenkohl next contends that the evidence was insufficient to support the required nexus for the firearm enhancement statute. See RCW 9.94A.533(3). For the purpose of this enhancement, the State must establish a nexus between the defendant, the weapon, and the crime. State v. Houston-Sconiers, 188 Wn.2d 1, 17, 391 P.3d 409 (2017). Such a nexus exists when the defendant and the weapon are in close proximity at the relevant time. Houston-Sconiers, 188 Wn.2d at 17. Sufficient evidence of nexus exists so long as the facts and circumstances support an inference of a connection between the weapon, the crime, and the defendant. Houston-Sconiers, 188 Wn.2d at 17.

The State proved such a nexus here. As detailed at length above, Nelson testified that Linenkohl pushed her and put a gun in her face. Nelson said that Linenkohl kept the gun pointed at her as he dragged Simerly toward the house. Simerly testified that when Linenkohl was forcing her back to the house, directly after she heard Linenkohl slam Nelson against a fence and Nelson scream, Linenkohl had a shotgun in his hand. The testimony supports a connection between the weapon, the crime, and Linenkohl. The evidence was sufficient to support the firearm enhancement.

The gist of Linenkohl's third claim appears to be that the State pursued an "all or nothing strategy" in regard to the charge of second degree assault because the jury was not instructed on an inferior degree crime or a lesser included offense. However, the jury was in fact instructed as to a lesser included offense: unlawful display of a weapon. The jury was instructed:

> The defendant is charged in Count I with assault in the second degree. If, after full and careful deliberation on this charge, you are not satisfied beyond a reasonable doubt that the defendant is guilty, then you will consider whether the defendant is guilty of the lesser crime of unlawful display of a weapon.
>
> When a crime has been proved against a person, and there exists a reasonable doubt as to which of two or more crimes that person is guilty [of], he or she shall be convicted only of the lowest crime.

Jury Instruction 16.

The court then instructed the jury regarding the crime of unlawful display of a weapon, including the elements of the crime.

To the extent Linenkohl suggests that the trial court erred by not instructing the jury regarding the crime of assault in the fourth degree, the

18

argument fails. The State did not charge Linenkohl with the crime of assault in the fourth degree, and Linenkohl was not on trial for that crime.

Linenkohl describes his fourth assignment of error as follows: "Abuse of Discretion/Prosecutorial Misconduct –Alternative or supplemental argument to counsel's BOA [Brief of Appellant], issue #2. Prejudicial testimony and speculation that I intended on engaging in an armed conflict with law enforcement." SAG at 2. Given Linenkohl's framing, we largely defer to our analysis above, but offer the following additional response to issues Linenkohl raises in this section of his SAG.

Linenkohl repeatedly alleges that exhibit 36 and clerk's papers 3-7 were improperly withheld from the jury. Linenkohl's attorney used exhibit 36 to question Detective Soderstrom on cross-examination, but the record does not reflect that the defense requested that this exhibit be introduced into evidence. And clerk's papers 3-7 consists of two documents: the State's "Prosecuting Attorney Case Summary and Request for Bail and/or Conditions of Release" and the State's "Certification for Determination of Probable Cause." Linenkohl does not point to any indication in the record that either party offered these documents for admission at trial. Linenkohl further appears to argue that the jury should have heard specific evidence that the jury did in fact hear. Linenkohl cites to ER 611, apparently referring to the court's reasonable control over the mode and order of interrogating witnesses and presenting evidence, but fails to demonstrate a violation of this evidence rule.

19

In short, Linenkohl's arguments in the statement of additional grounds for review do not set forth a basis for appellate relief.

Affirmed.

WE CONCUR: